JUDGE SWAIN

• AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

_____Southern_____ District of _____New York_____

Elizabeth Silverman as Executrix
of the Will of Victor Silverman,

V.

Lincoln Center for the Performing
Arts

**SUMMONS IN A CIVIL CASE**

**05 CV 2832**

CASE NUMBER:

TO: (Name and address of Defendant)

Lincoln Center of the Performing Arts
70 Lincoln Plaza
New York, NY  10023

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Gary Phelan, Esq.
Outten & Golden LLP
3 Park Avenue
New York, NY  10016

an answer to the complaint which is served on you with this summons, within _____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

CLERK

(By) DEPUTY CLERK

DATE  MAR 1 1 2005

JUDGE SWAIN

**OUTTEN & GOLDEN LLP**
Gary Phelan (GP 0600)
Wendi Lazar (WL0023)
Attorneys for Plaintiff
3 Park Avenue
New York, NY 10016
(212) 245-1000
Fax: (212) 977-4005

**05 CV 2832**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

ELIZABETH SILVERMAN, as
Executrix of the Will of
VICTOR SILVERMAN,

            Plaintiff,

- against -

LINCOLN CENTER OF THE
PERFORMING ARTS,

            Defendants.

-------------------------------------------------------x

Index No. Civ.

JURY TRIAL
DEMANDED

March 11, 2005

## COMPLAINT

As and for his Complaint in the above-captioned action, plaintiff, Elizabeth Silverman as Executrix of the Will of Victor Silverman, by and through her attorneys, Outten & Golden LLP, alleges and states as follows:

### NATURE OF THE ACTION

1.    The plaintiff, Elizabeth Silverman, as Executrix of the Will of Victor Silverman, brings this action to recover damages caused by the defendant's violation of, Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12203, et seq., the New York State Human Rights

T:\gp\Silverman, E\cmp 021105 Complaint.doc

Law, New York Executive Law §§ 290 et seq. ("NYSHRL"), and the New York City Human Rights Law, New York City Administrative Code §§ 8-101 et seq. ("NYCHRL"). The late Victor Silverman, Elizabeth Silverman's husband, worked for the defendant for fourteen years. The last position he held was Associate Director of Engineering. In June 2003, Mr. Silverman was diagnosed with lung cancer. After his diagnosis the defendant refused to provide him with accommodations he sought for his disability and began to denigrate his work performance for pretextual reasons and retaliated against him because he sought an accommodate and because he retained an attorney who sent a letter to the defendant to complain about disability discrimination. Mr. Silverman passed away on August 8, 2004 from the effects of his lung cancer. The discriminatory conduct to which he was subjected and the severe emotional distress Mr. Silverman suffered as a result of that distress contributed to his death.

## JURISDICTION AND VENUE

2.      This court has jurisdiction pursuant to 29 U.S.C. § 2617 and 28 U.S.C. §§ 1331, 1343. This court has supplemental jurisdiction over plaintiff's related claims arising under state and local laws pursuant to 28 U.S.C. § 1367(a).

3.      Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b) as this action arose, in substantial part, within the Southern District of New York, where the unlawful employment practices alleged herein occurred and many of the records pertinent thereto are maintained.

## PARTIES

4.      Plaintiff Elizabeth Silverman is a citizen of the United States and presently resides at 300 East 71st Street, Apartment 11H, New York, NY 10021. On January 6, 2005, Elizabeth Silverman was appointed as the Executrix of the Will of her husband, the late Victor Silverman. Mr. Silverman was an employee of defendant from March, 1990 through August 8, 2004. Mr.

Silverman was an individual with a disability within the meaning of the ADA, the NYSHRL, and the NYCHRL. At all times during his employment with defendant, Mr. Silverman was able to perform the essential functions of his position, with or without a reasonable accommodation, and, therefore, was a "qualified" individual with a disability, as that term is defined by the ADA, the NYSHRL and the NYCHRL.

5.Defendant Lincoln Center for Performing Arts ("Lincoln Center") is located at 70 Lincoln Plaza, New York, NY 10023. At all relevant times, Lincoln Center employed more than 15 persons.

## CONDITIONS PRECEDENT

6.Plaintiff timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC").

7.On or about December 13, 2004, Elizabeth Silverman received a Notice of Right to Sue with regard to the ADA claims from the EEOC. This action has been filed within ninety (90) days of receipt of that notice by Ms. Silverman. Ms. Silverman has fully complied with all prerequisites to jurisdiction in this Court under the ADA and will comply with the statutory requirements under the NYCHRL.

## ALLEGATIONS

8.At all relevant times, as a result of his lung cancer and its treatment, Mr. Silverman was substantially limited in one or more major life activities.

9.At all relevant times, Lincoln Center was aware that Mr. Silverman was substantially limited in some or more of his major life activities.

10.At all relevant times, Lincoln Center was aware that Mr. Silverman had a record of being

substantially limited in one or more of his major life activities.

11.     At all relevant times, Lincoln Center regarded Mr. Silverman as substantially limited in one or more major life activities.

12.     At all relevant times and as a result of his lung cancer and its treatment, Mr. Silverman has had a medical impairment that prevented the exercise of a normal bodily function and was demonstrable by medically accepted clinical or laboratory diagnostic techniques.

13.     At all relevant times, Lincoln Center regarded Mr. Silverman as having a medical impairment that prevented the exercise of a normal bodily function and was demonstrable by medically accepted clinical and laboratory diagnostic techniques.

14.     At all relevant times, Mr. Silverman had a physical and medical impairment to a system of the body.

15.     At all relevant times, Lincoln Center regarded Mr. Silverman as having a physical and medical impairment to a system of the body.

16.     In March 1990, Mr. Silverman was hired as the Building Manager for the Samuel B. and David Rose Building. In that position, he had a staff consisting of an Assistant Building Manager and Department secretary. Mr. Silverman worked in that position for thirteen (13) years.

17.     In March 2003, Mr. Silverman was transferred to the General Service Department as Associate Director of Engineering due to internal restructuring. His secretary was transferred with him and was able to help with the increase in paper work that came along with the new position.

18.     As the Associate Director of Engineering, Mr. Silverman's workload dramatically increased but his level of compensation remained the same. In June 2003, Mr. Silverman's

assistant was terminated and no replacement was hired, leaving Mr. Silverman to assume the assistant's workload in addition to his own. In January 2004, Mr. Silverman's supervisor, William Watkins, was fired/resigned. There was no replacement for this position either, resulting in another substantial increase in Mr Silverman's workload.

19. On May 27, 2003, Mr. Silverman suffered a seizure at his desk. The seizure was caused by a tumor located on the left occipital lobe of his brain.

20. On June 10, 2003, Mr. Silverman underwent surgery to remove the tumor at Columbia Presbyterian Hospital. The analysis of the tumor showed tissue consistent with lung cancer and subsequent tests determined the existence of cancer on the lung. Mr. Silverman returned to work one week after his surgery.

21. Shortly thereafter, Mr. Silverman began to receive chemotherapy treatments. Although Mr. Silverman was a very private person, he told his wife, Elizabeth Silverman, that he wanted to make sure everyone at Lincoln Center was aware of these treatments so that his time away from the building would not disrupt the flow of work to be done. In addition, Mr. Silverman made his chemotherapy appointments as early or as late as possible in the day so that neither his colleagues nor his supervisor would not be burdened with his workload and responsibilities. On the rare occasion when his chemotherapy could not be scheduled early or late in the workday, Mr. Silverman made sure his supervisors were aware of the schedule to ensure coverage.

22. During his chemotherapy treatments, Mr. Silverman worked approximately seven (7) hour days instead of his usual eight (8) hour day. He never asked Lincoln Center for any extended leave time, which would have been available to him pursuant to the ADA and the Family and Medical Leave Act, because he feared losing his job, felt tremendous pressure from management and was not made aware of what, if any, accommodations might be available to

him. Instead, he relied on his sick and vacation leave to accommodate his cancer treatments.

23.     In July 2003, Mr. Silverman was denied a review and ultimately a salary increase because Jerry Hastings, VP of Operations and Concert Halls, and William Watkins, Mr. Silverman's supervisor told him that they were not able to evaluate him because he was only in this particular position for 4 months since March 2003. Mr. Silverman told his wife, Elizabeth Silverman, how upset he was about this because it meant that he would not be receiving a raise for the work he had performed throughout the prior year particularly given his increased workload and responsibilities.

24.     In late fall of 2003, Liza Parker, VP of Human Resources ("HR"), asked to meet with Mr. Silverman. Ms. Parker inquired as to when Mr. Silverman would begin working full time. At that time, Mr. Silverman had been working seven (7) hour days rather than eight (8) hour days for several months. Mr. Silverman informed Ms. Parker that he would start working eight (8) hour days the following week. Rather than discuss an accommodation of his hours, Ms. Parker suggested to Mr. Silverman that he could go out on disability or maybe even consider early retirement options. Mr. Silverman told Ms. Parker that he was doing fine, was prepared to work full time, and was not interested in taking disability leave or early retirement. Ms. Parker then suggested that Marina Sgroi, Director of HR, could prepare for Mr. Silverman a report showing him the different options and benefits. Mr. Silverman agreed to look at these options for informational purposes only. At this meeting, Ms. Parker stated several times that she was not pressuring Mr. Silverman, but when he came home that day after the meeting he told me how uncomfortable he felt and that he was feeling pressured by HR.

25.     Several weeks after his meeting with Liza Parker in the fall of 2003, Mr. Silverman received a sloppy handwritten report that was not all-inclusive regarding the information about

6

his retirement and disability leave options. These reports are usually prepared by an actuarial firm.

26. On June 10, 2004, Mr. Silverman met with Gerald Hastings, VP of Operations and Concert Halls, regarding his work performance review. His review was very positive and complimentary. The last part of the review added new tasks to Mr. Silverman's list of responsibilities, such as typing his own contracts, because there were no plans to replace his Administrative Assistant. Mr. Silverman articulated his discontent with the arrangement but told Mr. Hastings he would do the best he could. Mr. Silverman then asked Mr. Hastings what his recommendation for his salary increase was going to be Mr. Hastings responded that it would be 3%. Mr. Silverman stated that, based on his performance, taking on additional responsibilities, and Mr. Hastings' positive evaluation of his work, a 3% raise was insulting and unfair. Mr. Silverman added that a 5% raise would be a fair increase, particularly because he had been in this new position without an evaluation for 15 months.

27. On June 24, 2004, Mr. Silverman met with Mr. Hastings again for his official salary review. Mr. Hastings stated that he met with Liza Parker, VP of HR, and Marina Sgroi, Director of HR, to discuss Mr. Silverman's request for a 5% raise. Mr. Hastings told Mr. Silverman that Marina Sgroi said she thought that 3% was a more than adequate raise because they had made accommodations for Mr. Silverman during his illness.

28. As a department head, Mr. Silverman regularly gave 5% increases without HR's approval.

29. On June 28, 2004, Mr. Hastings told Mr. Silverman that he spoke with HR but was not able to get Mr. Silverman anymore than a 3% increase. Mr. Silverman told Mr. Hastings that this was not fair considering the amount of work Mr. Silverman had been doing. Mr. Hastings

then told Mr. Silverman that he was being considered for another promotion as of August 1, 2004 to the position of Director of Operations. Mr. Silverman asked Mr. Hastings if the promotion included a salary increase and told him politely that, if it did not, he was not interested. Mr. Hastings later became enraged and, in a phone call with Mr. Silverman an hour later, hung up the phone on him without explanation. Mr. Silverman returned home from work that day terribly distraught and told me he felt that Lincoln Center was trying to force him to leave.

30. Mr. Silverman's colleagues soon began telling him that HR and management were "coming after" him. Mr. Silverman after came home crying and would be inconsolable for hours because other engineers at work were telling him that he was going to be fired. Mr. Silverman believed these rumors to be true because he felt extraordinary pressure to either accept early retirement or long-term disability and to leave the job that he loved so much. Mr. Silverman began to fear going to work because he thought that Lincoln Center was going to fire him or in some other way force him out.

31. Mr. Silverman was very upset and distraught due to the way he was being treated at work and decided to contact an attorney. On July 1, 2004, he met with attorney, Wendi Lazar, in New York City and she agreed to represent him.

32. On July 16, 2004, prior to his vacation, Mr. Silverman arrived at work to find a formal memo on his desk from Mr. Hastings denigrating his performance. Mr. Silverman was devastated by this memo because it came just three weeks after he received the exceptional performance evaluation and he felt it was clear-cut retaliation.

33. On July 20, 2004, Attorney Lazar sent a letter to Liza Parker on behalf of Mr. Silverman describing what Mr. Silverman believed to be discriminatory treatment of him because of his

disability and requesting, on his behalf, reasonable accommodations for his disability. This letter was sent via FedEx overnight delivery to Liza Parker and her attorneys on that day.

34. On July 22, 2004, employees from the defendant's were meeting with Mr. Silverman on another employee matter and Liza Parker was extremely hostile toward him. Throughout the meeting Ms. Parker was staring, leering, and grinning at Mr. Silverman. Mr. Silverman came home that day again feeling so distressed and believing that his termination was both imminent and inevitable.

35. Mr. Silverman's last day of work was Friday, August 6, 2004 because he suddenly and unexpectedly passed away on August 8, 2004.

36. Several of his co-workers told Mr. Silverman that the defendant was "coming after" him.

37. The defendant subjected Mr. Silverman to adverse terms and conditions of employment, including, but not limited to, reducing his pay increase because they had accommodated him at one point, refused to accommodate his disability, and substantially increased his workload because of his disability, in violation of Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. 12201 § et. seq.

38. The defendant retaliated against Mr. Silverman because he sought accommodations for his disability.

39. The defendant retaliated against Mr. Silverman because he retained an attorney when sent a letter to the defendant complaining about disability discrimination.

40. Lincoln Center's actions set forth in this Complaint were intentional.

41. At all relevant times, Mr. Silverman was qualified to perform the essential functions of his position as Associate Director of Engineering with or without reasonable accommodation.

42. As a result of Lincoln Center's actions, Mr. Silverman suffered the loss of wages and

benefits and severe emotional substantial physical and emotional pain and suffering which contributed to his death.

## FIRST COUNT
### Failure to Reasonably Accommodate in Violation of the ADA

43. The plaintiff incorporates paragraphs 1 though 42 by reference.

44. Mr. Silverman's medical conditions as described in this Complaint constituted a "disability" within the meaning of the ADA. 42 U.S.C. §12101(2).

45. The ADA prohibits discrimination based on disability and defines discrimination as including failure to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified [employee] with a disability." 42 U.S.C. §§ 12112(a), 12112 (b)(5).

46. By its actions, Lincoln Center violated Title I of the ADA by failing to accommodate Mr. Silverman's known physical limitations brought on by his disability.

47. Mr. Silverman has suffered damages as a result of Lincoln Center's unlawful acts, including past and future lost wages and benefits, past and future physical and emotional distress, and the costs of bringing this action.

## SECOND COUNT
### Discriminatory Treatment in Violation of the ADA

48. Mr. Silverman incorporates paragraphs 1 though 42 by reference.

49. Mr. Silverman's medical conditions as described in this Complaint constituted a disability within the meaning of the ADA. 42 U.S.C. §12101(2).

50. By its actions, Lincoln Center violated the ADA knowingly and intentionally refused to

10

paying him a 3% annual salary increase rather than a 5% annual salary increase because it had provided him with an accommodation for his disability.

51.    Mr. Silverman suffered damages as a result of Lincoln Center's unlawful acts, including past lost wages and benefits, past physical and emotional distress, and the costs of bringing this action.

### THIRD COUNT

**Discriminatory Treatment Based on Perceived Disability in Violation of the ADA**

52.    Mr. Silverman incorporates paragraphs 1 though 42 by reference.

53.    Lincoln Center regarded Mr. Silverman as suffering from a physical impairment that substantially limits one or more major life activities.

54.    Lincoln Center violated the ADA when it discriminatorily paid Mr. Silverman a 3% rather than 5% annual wage increase because it regarded him as having a disability.

55.    Mr. Silverman has suffered damages as a result of Lincoln Center's unlawful acts, including past and future lost wages and benefits, past and future physical and emotional distress, and the costs of bringing this action.

### FOURTH COUNT

**Failure to Reasonably Accommodate in Violation of the
New York State Human Rights Law
N.Y. Exec. L. §§ 290 et seq.**

56.    Ms. Silverman incorporates paragraphs 1 though 42 by reference.

57.    Mr. Silverman's medical conditions as described in this Complaint constitute a disability within the meaning of the New York State Human Rights Law, N.Y. Exec. L. § 292(21).

11

58. The New York State Human Rights Law provides, "it shall be an unlawful discriminatory practice for an employer ... to refuse to provide reasonable accommodations to the known disabilities of an employee." N.Y. Exec. L. § 296(3)(a).

59. By its actions, Lincoln Center violated the New York State Human Rights Law, N.Y. Exec. L. § 296, by failing to accommodate Mr. Silverman's known disability.

60. Mr. Silverman has suffered damages as a result of Lincoln Center's unlawful acts, including past and future lost wages and benefits, and past and future physical and emotional distress.

## FIFTH COUNT

### Discriminatory Treatment Based on Disability in Violation of the
### New York State Human Rights Law
### N.Y. Exec. L. §§ 290 et seq.

61. Mr. Silverman incorporates paragraphs 1 though 42 by reference.

62. Mr. Silverman's medical conditions as described in this Complaint constituted a disability within the meaning of the New York State Human Rights Law. N.Y. Exec. L. § 292(21).

63. By its actions, Lincoln Center violated the New York State Human Rights Law when it paid Mr. Silverman 3% rather than 5% annual wage increase.

64. Mr. Silverman has suffered damages as a result of Lincoln Center's unlawful acts, including past lost wages and benefits, and past physical and emotional distress.

## SIXTH COUNT

### Discriminatory Treatment Based on Perceived Disability in Violation of the
### New York State Human Rights Law
### N.Y. Exec. L. §§ 290 et seq.

65. Mr. Silverman incorporates paragraphs 1 though 42 by reference.

66. Lincoln Center regarded Mr. Silverman as suffering from a physical impairment that prevented the exercise of normal bodily functions.

67. Lincoln Center violated the New York State Human Rights Law when it subjected him to unfavorable terms and conditions of employment because it regarded him as disabled. N.Y. Exec. L. §§ 292(21)(c), 296(1)(a).

68. Mr. Silverman has suffered damages as a result of Lincoln Center's unlawful acts, including past and future lost wages and benefits, and past and future physical and emotional distress.

## SEVENTH COUNT

### Failure to Reasonably Accommodate in Violation of the New York City Human Rights Law
### N.Y. City Admin. Code §§ 8-101 et seq.

69. Mr. Silverman incorporates paragraphs 1 though 42 by reference.

70. Mr. Silverman's medical conditions as described in this Complaint constitute a disability within the meaning of the New York City Human Rights Law. N.Y.C. Admin. Code § 8-102(16).

71. The New York City Human Rights Law requires employers to "make reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job." N.Y.C. Admin. Code § 8-107(14)(a).

72. By its actions, Lincoln Center violated the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107, by failing to accommodate Mr. Silverman's known disability.

73. Mr. Silverman has suffered damages as a result of Lincoln Center's unlawful act, including past and future lost wages and benefits, past and future physical and emotional distress, and the costs of bringing this action.

## EIGHTH COUNT

### Discriminatory Treatment Based on Disability in Violation of the
### New York City Human Rights Law
### N.Y. City Admin. Code §§ 8-101 et seq.

74. Mr. Silverman incorporates paragraphs 1 though 42 by reference.

75. Mr. Silverman's medical conditions as described in this Complaint constitute a disability within the meaning of the New York City Human Rights Law. N.Y.C. Admin. Code § 8-102(16).

76. The defendant's decision to pay Mr. Silverman a 3% annual wage increase rather than a 5% annual wage increase because it had offered him an accommodation for his disability violated the N.Y.C. Admin Code §8-107.

77. By its actions, Lincoln violated the New York City Human Rights Law by subjecting him to unfavorable terms and conditions of employment because of his perceived disability Mr. Silverman because of his known disability or perceived disability. N.Y.C. Admin. Code § 8-107.

78. Mr. Silverman has suffered damages as a result of Lincoln Center's unlawful acts, including past and future lost wages and benefits, past and future physical and emotional distress, and the costs of bringing this action.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff respectfully requests that this Court:

1. Accept jurisdiction over this matter;

2. Order the defendants to compensate the plaintiff for his past and future loss of wages and benefits, plus interest;

3. Enter judgment in favor of the plaintiff for such amount as may be awarded by a jury for compensatory damages for his physical and emotional suffering and loss of enjoyment of life;

4. Enter judgment in favor of the plaintiff for such amount as may be awarded by a jury for punitive damages;

5. Reinstate the plaintiff to his former position or, in lieu of reinstatement, award him front pay (including benefits);

6. Award to the plaintiff liquidated damages as provided for willful violations of the FMLA;

7. Award to the plaintiff all costs and reasonable attorneys' fees incurred in connection with this action;

8. Grant such additional or alternative relief as may appear to this Court to be just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims properly triable by a jury.

Dated: New York, New York
March 11, 2005

        Respectfully submitted,

        OUTTEN & GOLDEN LLP

        By: *[signature]*
        Gary Phelan (GP 0500)
        Wendi S. Lazar (WL 0023)
        Attorneys for the Plaintiff
        3 Park Avenue
        New York, NY 10016
        (212) 245-1000
        Fax: (212) 977-4005